**Affirmed; Opinion Filed July 11, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-01208-CR

**ENRIQUE GUTIERREZ AROCHI, a/k/a ENRIQUE AROCHI GUTIERREZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-80513-2015**

## MEMORANDUM OPINION
Before Justices Bridges, Myers, and Schenck
Opinion by Justice Myers

A jury convicted appellant Enrique Arochi of aggravated kidnapping. The trial court assessed punishment at life imprisonment. Appellant brings six issues on appeal contending: (1) the evidence is insufficient to prove he committed the offense of aggravated kidnapping; (2) the trial court erred in denying his request for the jury to be charged on the lesser-included offenses of kidnapping and unlawful restraint; (3) the trial court erred in denying his motion to change venue; (4) the trial court erred in denying his motion to suppress evidence obtained by placement of a tracking device; (5) the trial court erred in overruling his objections to a "jury view" of evidence; and (6) the trial court erred in overruling his motion to quash the indictment. We affirm the trial court's judgment.

BACKGROUND

Paulina Petrosky and the victim in this case, Christina Morris, were friends from Allen High School. Petrosky graduated in 2010, one year after Morris, and the two had remained friends. Petrosky, an account manager for an insurance company, lived in an apartment complex located at the Shops at Legacy in Plano, Texas, a mixed-use residential and commercial property with shops, restaurants, bars, and adjoining apartments. Morris, who worked at a dating service, had moved to Fort Worth to live with her boyfriend, Hunter Foster, and Petrosky and Morris no longer saw much of each other. On Friday, August 29, 2014, Petrosky learned Morris was going to be in town for the Labor Day weekend, and she texted other friends and gathered a group of people who were planning to go out that evening. One of those people was the appellant, Enrique Arochi.[1] Arochi also attended Allen High School and graduated in 2009, the same year as Morris. Petrosky knew him through mutual friends, but the two were not close and they had never really "hung out" together until the summer of 2014.

The group gathered at Petrosky's apartment on the evening of Friday, August 29th. Morris arrived at around 9 p.m., followed by Sabrina Boss, Steven Nickerson, and Arochi. James Nyawera, Justin Hill, and Brea Lofton arrived together at around 10 p.m. Everyone in the group except for Sabrina Boss, a friend of Petrosky's from college, had attended Allen High School. They started drinking at Petrosky's apartment, but the plan was to go out to the bars at the Shops at Legacy complex.

Several members of the group parked their cars in a parking garage at Petrosky's apartment complex. However, parking at that garage was limited and people were only allowed to park there for about an hour, so they moved their cars to the parking garage by Henry's Tavern, one of the two bars the group visited that evening, parking close to or within a few spaces of each other.

---

[1] Also known as Enrique Gutierrez Arochi or Enrique Arochi Gutierrez.

Morris was driving a silver Toyota Celica. Arochi was driving a gray Camaro.

As Hill recalled, the group "kind of got our plans confused" and they ended up at different bars. Lofton, Nyawera, and Hill went to Scruffy Duffies; everyone else went to Henry's Tavern, arriving there at around 11:00 p.m. Petrosky, Morris, Boss, Nickerson, and Arochi stayed at Henry's for around thirty minutes before joining Lofton, Nyawera, and Hill at Scruffy Duffies. Everyone left their cars in the parking garage near Henry's Tavern. When the bar closed at 2 a.m., Lofton, Nyawera, and Hill went home. The rest of the group—Morris, Arochi, Boss, Nickerson, and Petrosky—intended to go back to Petrosky's apartment. But Petrosky, Boss, and Arochi wanted to get some food, so Boss drove them in her car to a Whataburger restaurant that was about three or four miles away. They ordered from the drive-through and then drove back to Petrosky's apartment. By the time they got back to Petrosky's apartment, Morris and Nickerson had walked back to the apartment and were waiting for them.

At Petrosky's apartment, the remaining members of the group ate their food and talked. Morris, meanwhile, exchanged text messages with Foster, who did not accompany her that evening, and it appears she grew increasingly upset that he was not responding. Foster's last text message to Morris was sent at 2:03 a.m. on August 30, 2014. At 2:12 a.m., Morris asked Foster if he could come and pick her up at the party. At 2:20 a.m., she asked him to please tell her what was going on. Morris texted Foster at 2:25 a.m. that she had lost her car keys. She texted at 2:27 a.m., "Wtfff hunter please." At 2:32 a.m. she texted, "I have work." Two minutes later, she texted that she had found her keys. Morris also said she was "throwed," which is slang for intoxicated, and she pleaded with Foster to come and get her. At 3:01 a.m., she texted "[g]oodnight." Three minutes later, she texted that she hoped Foster was okay, she was not, and that her phone was dead. At 3:10 a.m. Morris texted, "U lost the best thing to even [sic] happen to u." Three minutes later she added, "U will see one day." At 3:16 a.m., Morris texted Foster that she was "taking a taxi

home" and "[s]ee ya one day." At 3:29 a.m., she implored Foster to answer and that she was not angry. Morris's last three text messages to Foster from her phone indicated that her phone was dead (3:29:52 a.m.), she was driving home (3:29:52 a.m.), and she wanted to be able to get into their home in Fort Worth. That last text message from Morris to Foster was sent at 3:48:21 a.m. on August 30, 2014.

Petrosky and Nickerson testified that they tried to console Morris, who was crying and upset. Morris had been thinking of spending the night at Petrosky's apartment, but she changed her mind and decided to go back to Fort Worth. Nickerson and Petrosky eventually calmed Morris down, telling her to stop crying before she drove home.

Petrosky testified that Morris, a light drinker, had little to drink that night and that it was earlier in the evening, so she was capable of driving herself home. Nickerson also did not think Morris was too intoxicated to drive. He testified that she asked him to drive her back to Fort Worth. He tried to talk her out of going back to Fort Worth, telling her it was probably better that she stay at the apartment and "sober up" first. He said "we had been drinking all night" and that "[s]he probably shouldn't have driven," but he was sure Morris "could have made it home." He testified that she "was emotionally upset" but did not seem intoxicated. Nickerson offered to take her home in the morning, but "[s]he was pretty dead set on going home."

At times during the evening, Sabrina Boss thought Arochi was romantically interested in her. He would brush up against her or was always close to her "and stuff like that, just always close." She was not romantically interested in him. After they returned to Petrosky's apartment, Boss wanted to lay down on the couch but Arochi was sitting on the couch and would not move over, so she went over to Petrosky's bed and laid down. Petrosky was already in bed by that point. Approximately ten minutes later, Arochi came into Petrosky's bedroom and said, "Fine, I'll just go home." Boss recalled Arochi seemed "a little upset" when he said that, and that she believed

he wanted to lay on the couch with her. Boss said Arochi's tone suggested he was angry. Arochi offered to walk Morris to her car, and they left Petrosky's apartment together.

Nickerson waited about ten minutes and called Morris to make sure she made it safely to her car. She said she was still walking to her car and was almost there, and would text him once she had reached her car. Nickerson recalled that Morris was not expressing any fear and she did not seem worried. Five minutes later, he texted her to see if she had made it to her car; there was no response. He called her several times and reached her voicemail. He also tried calling her the following day and the call went to her voicemail.

Parking garage security camera footage shows Arochi and Morris walking into the parking garage together at 3:55 a.m. on August 30, 2014. There is no indication from this video that anything is amiss between them. Arochi's car backed out of its parking space at 3:57 a.m., and it left the garage at 3:58 a.m., exiting onto Bishop Road. Morris's vehicle is not shown leaving the garage. The security camera footage that was admitted into evidence also does not show Morris leaving the parking garage by any other means, though police admitted it was possible for someone to have left on foot and not be recorded if they knew where the cameras were located and were "very strategic" in how they moved. No other person is shown leaving the parking garage during the next twenty or thirty minutes after Morris is last seen at 3:55 a.m., and no other cars pulled in or out of the garage until 4:34 a.m.[2]

Morris, who stood 5' 2" tall and weighed under 100 pounds, was known by her friends and family to be afraid of the dark. They said she would never walk anywhere alone in the dark, even to her car or the mailbox, and would never willingly climb into the trunk of a car. She was also claustrophobic, according to her father, and being in the trunk of a car would be terrifying for her.

---

[2] The video covering the garage area showed a green Kia Soul circling the garage multiple times at 4:08 a.m., but Detective Aaron Benzick testified that this was typical of an Uber driver looking for his passenger. The driver of the Kia was not identified.

Her boyfriend, Hunter Foster, likewise testified that he had never known her to get into the trunk of a car and that she was afraid of the dark and never wanted to go anywhere by herself in the dark.

Friends of Morris described her as an outgoing, intelligent, and attractive woman, who was sometimes stubborn and not easily swayed. Her boss at the dating service where she worked described her as "fun and fiery." A childhood friend, Sydney Robertson, recalled that Morris was "headstrong" and would never "do anything that she doesn't want to do." Robertson also thought that Morris would fight back if threatened. Her friend Ariel Hammer said "[s]he was definitely headstrong, diligent."

Petrosky, Robertson, Morris's boss, and her father all testified that they suspected Foster either used or sold drugs. When he testified at trial, Foster was serving a 33-month sentence in federal prison after pleading guilty to conspiracy to distribute MDMA, also known as ecstasy. Testifying under an immunity agreement with the State, Foster told the jury he went to a bar in Dallas called the Concrete Cowboy on the night of August 29, 2014, with his friend Taylor Barry, and that he was selling as well as using drugs. Morris was upset with him because she wanted him to come to the party. Foster was at the bar for most of the night, and after it closed at 2:00 a.m., he visited some friends of Taylor's at the nearby W hotel. He did not go to Plano at all that night. Foster admitted the evening was a "blur." In addition to using MDMA and Xanax, he was also drinking alcohol.

Foster testified that Morris texted him repeatedly but he did not read her texts and was not even looking at his phone. Morris was not at home when he returned the next day at around 10:00 or 11:00 a.m., but he thought she was still angry with him and had stayed with her friends. He went out again on the night of Saturday, August 30th, and did not hear from Morris at all. When her father called the following Monday (which was Labor Day) asking where she was, Foster started to worry and checked with Petrosky. She told him Morris had walked out with Arochi, so

Foster called him. Arochi falsely told Foster he had walked about halfway with Morris and then separated from her because they were parked in different garages.

Morris was scheduled to report to work on the morning of Saturday, August 30, 2014. When she did not show up as planned, a co-worker called her but there was no answer. This was unusual because Morris was known as a good employee who did not skip work, and August 30th was an important day for the dating service where Morris worked since it was their last working day of the month. The co-worker called her supervisor, Taylor Shelton, who tried calling Morris repeatedly. Those calls went to voicemail. Shelton also texted and called Foster, who did not respond. Shelton checked Morris's Facebook page and saw a message there from one of Morris's friends, who said she was "worried sick" about Morris and that she should call. Shelton spoke to the friend, and the friend contacted Morris's family.

Morris's father, stepmother, and mother started calling her friends and learned that she had left the party with Arochi. They eventually obtained Arochi's phone number and spoke to him. Arochi told Morris's stepmother, according to her testimony, that he and Morris left Petrosky's apartment at the same time but "[w]hen they got to the sidewalk, when they got to the street, they went their separate ways." Arochi said Morris went off on her own and that she was talking loudly with someone on the phone. It was at this point, Morris's stepmother recalled, that she "felt like something was really, really wrong," because Morris would never have walked alone at night. They called the police and reported her as missing. At around midnight on September 2, 2014, or during the early morning hours of September 3rd, a police officer located Morris's Toyota Celica in a parking garage at the Shops at Legacy. It was parked normally, the doors were locked; there was nothing out of the ordinary. Morris's father—the car was registered in his name—had a key to the car and drove it home.

The police, aided by volunteers, conducted an extensive search for Morris, beginning with

the parking garage where her car was found—located at 5725 Legacy Drive, behind Henry's Tavern. The police searched every level of that parking garage but did not find anything suspicious. The garage was photographed and CSI technicians used ALS, or alternative light source, and Bluestar, a "bloodstain reagent" that fluoresces blue upon contact with the iron in blood, to search for blood or other bodily fluids. They did not find any evidence in the parking garage indicating the presence of blood or bodily fluids.

Police searched both Morris's and Arochi's financial records, including their bank accounts and credit card transactions. Arochi's financial records show charges at Henry's Tavern on August 29, 2014, and both Arochi's and Morris's records show charges at Scruffy Duffies on August 30th. There is no activity on Morris's accounts after that date except for some automatic recurring payments. In addition, Arochi purchased gas at a Kroger store on East Bethany Drive, in Allen, not far from his home, at 9:58 a.m. on August 30th. Detective Jerry Minton of the Plano Police Department, who reviewed Arochi's and Morris's financial records, testified that Arochi typically purchased gasoline approximately every ten or eleven days, but that he had purchased gas approximately five days prior to the August 30th transaction at the East Bethany Kroger store. Security camera video from the Kroger gas station obtained by the police showed Arochi wiping off the passenger side of the car with a rag, and then looking at the trunk twice before using squeegee to clean the trunk area of the car. He also spent money for an automatic car wash at 9:27 a.m. on September 3, 2014.

The police searched for security camera footage from businesses located along the route Morris and Arochi walked on their way to the 5725 Legacy Drive parking garage, as well as the garage itself, and recovered a number of recordings. At 3:53 a.m., video from a security camera at the Benchmark Bank showed Arochi and Morris walking past the bank, crossing Legacy Drive, which was a divided road, and heading in northerly direction. At approximately 3:55 a.m., they

passed the Sean David Salon.  There is nothing out of the ordinary shown occurring in these videos.

Security camera video from the 5725 Legacy Drive parking garage revealed that Arochi's and Morris's cars were parked nearly facing each other, with one space between them.  Security camera video showed Arochi's car pulling out of its parking space but there was no movement in or around Morris's vehicle.  A digital media specialist with the Plano Police Department conducted a frame-by-frame analysis of the security camera footage showing Arochi's car backing up out of its parking space and leaving the garage.  He could not say if there was a passenger in Arochi's car when it pulled out of the garage because of its tinted windows, and it was impossible to determine if there was any damage to the vehicle.

Police obtained Morris's and Arochi's cell phone records, discovering that both Morris's and Arochi's cell phones connected with the same cell towers during the time after Arochi's car left the 5725 Legacy Drive parking garage.  Those towers were located at 5305 Laser Lane, near Spring Creek Boulevard, not far from the Shops at Legacy, and, further north, at 5800 Granite Parkway, near the intersection of the Dallas North Tollway and Highway 121, also known as the Sam Rayburn Tollway.  Morris's phone "pinged" off of the Spring Creek Boulevard cell tower at 3:46 a.m. on August 30, 2014, and Arochi's cell phone pinged off of that same cell tower at 3:57 a.m.  Morris's phone pinged off of the cell tower at 5800 Granite Parkway at 4:17 a.m.  Arochi's cell phone pinged off of that tower at 4:27 a.m., Morris's phone pinged off of the same tower at 4:47 a.m. and 4:48 a.m., and Arochi's cell phone also pinged off of that tower again at 4:56 a.m.  At 5:32 a.m., Arochi's phone pinged off of a cell tower located on East Bethany Drive, not far from his home on Harvard Lane, in Allen.  These cell tower connections were of the type indicating transfers of data, not voice call or text activity.  There is no data activity on Arochi's phone between 4:27 a.m. and 4:56 a.m.  The last recorded activity on Morris's phone was at 4:48 a.m. on August 30, 2014.

Detective Aaron Benzick concluded from the cell tower records that Arochi initially headed northeast on Highway 121, away from the Shops at Legacy, which was consistent with Arochi's toll road records. Toll records show his car went through the Custer Road and Highway 121 toll gantry, located to the northeast of the Granite Parkway cell tower, at 4:08 a.m. on August 30th. Benzick also noted that Morris's and Arochi's cell phones both connected with the Granite Parkway cell tower at between 4:27 a.m. and 4:56 a.m., but this occurred after Arochi's car had passed the Highway 121 toll gantry. Benzick believed that Arochi's car turned around after exiting the toll road, which would have put both phones moving in a southeasterly direction, back towards The Shops at Legacy, at between 4:27 a.m. and 4:56 a.m. on August 30th. No toll road records showed Arochi's vehicle exiting or re-entering the toll road, but Benzick testified a vehicle could exit the tollway after passing the toll gantry and it would not register. The detective acknowledged that a cell phone may not necessarily connect with the cell tower to which it is closest.

Police investigated Foster for a possible role in Morris's disappearance. He was uncooperative at first, refusing to allow them to see his cell phone and giving it to them only after deleting certain messages. He was later arrested on federal drug charges, and it was revealed at trial that he sold drugs to an undercover federal officer on the night of August 29, 2014. His cell phone records show he received a phone call from Arochi's phone at 3:50 a.m. on August 30th, when Morris was last seen in Plano, and Foster's cell phone was pinging off of a cell tower located on McKinney Avenue, in downtown Dallas. He received text messages from Arochi's phone at 3:53 a.m., "Hey[,] I need an oz can u hook it up," and at 3:55 a.m., "Of that good rock,"[3] when Foster's phone was pinging off of a cell tower located at the Woodall Rogers Freeway, near downtown Dallas. Foster provided alibi information to the police, giving the names of two people

---

[3] Detective Robyn Busby, the lead detective in this case, testified that this was "drug related" talk possibly referring to "rock crack cocaine" or "meth that comes in a rock" form.

he said he was out with on the night of Morris's disappearance. After reviewing cell phone records, toll road records, and interviewing witnesses, the Plano police ruled him out as a suspect.

Arochi was voluntarily interviewed by the Plano police several times—twice on September 3, 2014, and again on September 4th. These interviews were recorded and admitted into evidence. Arochi initially told Detective Cathy Stamm during the first interview on September 3rd that he and Morris parted at the end of the apartment complex after leaving Petrosky's apartment and that they were parked in different garages. Arochi said she was talking to someone on her cell phone as she walked away. He claimed he was not paying attention to her conversation because he was talking to his girlfriend on his phone. The detective asked Arochi if she could look at his phone log and see when he called his girlfriend that morning, at which point Arochi said they were texting. The detective asked if the text messages would show what time they were sent. Arochi looked down at his phone and scrolled through it for a couple of minutes, and then said the text messages were not there because his phone was set up to automatically delete older messages.

Arochi's cell phone records showed that he texted his girlfriend at 8:02 p.m. on Friday, August 29th, several hours before the party, that he was "[t]aking the black off my rims," which she interpreted to mean he was removing black paint from the rims on his car. They exchanged text messages over the next couple of hours, and made plans to see each other the following day. At 10:38 p.m. she asked him to call her. At 10:41 p.m., by which time he was on his way to—if not already at—Petrosky's apartment, he texted her that he wanted to see her but he was sleepy and needed to rest. He texted her goodnight at 10:44 p.m. As far as his girlfriend knew, Arochi was at home asleep. She did not hear from him for the rest of the night. According to the cell phone records, Arochi did not text her again until 10:52 a.m. the following morning, August 30th.

Stamm asked Arochi if they could look at his car, and he said yes. Stamm escorted Arochi down to the parking lot of the police station, where his 2010 gray Camaro was parked. She

photographed the car using a digital camera because CSI investigators were not available, and she noticed a dent on the front passenger side of the vehicle. Stamm was joined in the parking lot by Detective Robyn Busby, who noticed that the interior of the car, specifically the front passenger side floorboard, had been recently vacuumed—she testified that she could see the vacuum marks. A photograph taken by Stamm showed a dent on the Camaro's right front fender. Stamm also noticed injuries on Arochi as she was talking to him. She saw a bruising on the inside of his forearm, what looked like either scratch or bite marks on the inside of the forearm, and some bruising on the thumb. A forensic dentist, Dr. Paula Brumit, later examined photographs of Arochi's injuries that were sent to her by the Plano police and opined that the marks and scratches were not bite marks.[4]

On the evening of September 3, 2014, the police asked Arochi to return for further questioning, and he agreed to a second interview. During this interview, Stamm was joined by Detective Benzick, who was more familiar with the Shops at Legacy because he had been assigned there as a neighborhood patrol officer. Arochi again said he and Morris left Petrosky's apartment together and that they separated as soon as they left the apartment complex. He told Benzick and Stamm he did not know where Morris or the others in the group had parked. But security camera footage showed Arochi, Morris, and others in the group all arriving at same parking garage—the one located at 5725 Legacy Drive, where Morris's car was found—at close to the same time and that Arochi's car was parked one space across and one space over from Morris's car. Stamm asked Arochi if Morris had ever been in his car and he shook his head no. She asked, "Not at all?" "Never," he said. Arochi also told the detectives that he left the Shops at Legacy and drove home on Highway 75, but his toll road and cell phone records indicated he followed the Dallas North Tollway to Highway 121, passing through the Highway 121 toll gantry at 4:08 a.m. on August

---

[4] Dr. Brumit was called to testify by the defense.

30th. Toward the end of the interview, when Detective Stamm presented Arochi with still images from the security cameras showing Arochi and Morris walking into the 5725 Legacy Drive parking garage together, and Arochi's car leaving that garage, he said he could have moved his car to that garage but he was too intoxicated that night to remember where he had parked.

Arochi allowed the police to take photographs of himself and his car following the second interview on September 3rd. Those photographs show large discolorations or possible bruises above Arochi's right wrist. There were scratches or abrasions on his right forearm and on the knuckles of his right hand, a minor scrape or scratch on the left arm, and an abrasion on a knuckle of his left hand. Photographs of the Camaro, taken in the parking lot of the police station, show the dent on the right front fender.

Arochi was interviewed a third time by the Plano police on September 4, 2014. Arochi's parents were present during this interview and, as before, police testified that he was free to leave and not under arrest. During this interview, Arochi told Detective Stamm that he took an Adderall earlier in the day on August 29th and smoked some marijuana.[5] He said he drank heavily that night and was too intoxicated to remember that he and Morris were parked in the same garage. Stamm pointed out that in the parking garage security video he can be seen walking into the garage with Morris and that his Camaro was parked close to her Celica. Arochi said he had no idea where she was parked, that he was not paying attention and was minding "his own business," and that "it was a blurry night." He also did not recall what kind of condition Morris was in when they were walking to the garage, telling Stamm he simply did not remember and that he sometimes blacked out when he drank too much.

Arochi also gave his consent for the police to search his car. Following his September 4th

---

[5] Only part of this interview was recorded. Stamm testified that she forgot to flip a switch that activated the video recorder. There was a backup audio recorder running but it recorded only part of the interview because it ran out of memory. At some point the video recording device was activated, but it recorded only part of the interview and it has no audio. Stamm testified that not much of the interview was omitted from the audio recording that was admitted into evidence.

interview, the Camaro was taken to a CSI garage bay where it was photographed, and a photo of the right front side again shows the dent on the fender. In addition, the interior of the car was searched and swabs were taken on September 4th, but there were no results appearing to be of forensic value, according to Plano investigator Michelle Boubel.

On September 4, 2014, police obtained a court order authorizing the installation of a GPS tracking device on Arochi's car. While Arochi was being questioned, Detective Fred Garcia attempted to place the tracking device on the underside of Arochi's car, but he could not install it because of the car's low profile. The detective testified that while he was trying to install the tracker he noticed the Camaro was exceptionally clean underneath. He said he "usually got a face full of dirt" and his "hand comes out either black or just full of stuff," but in this case it "came back clean," which "was just very strange." Later that day, the police convinced Arochi to come back so they could take another look at the vehicle. The car was taken to a CSI garage and, while there, the detective said he was able to "wiggle" his way underneath the car and install the tracker. Garcia again noticed the undercarriage "was absurdly clean." He testified that he had "been under brand-new cars on car lots" that were not that clean. The car's movements were monitored, but no data from the tracking device was introduced into evidence.

Arochi was supposed to have started work at 8:00 a.m. on August 30, 2014. He clocked in at 10:51 a.m. According to a co-worker, he "looked, kind of, hungover from the night before" and "rough around the edges, I guess you could say." This co-worker noticed Arochi was limping and there were bruises and scrapes that went up his arm, and the co-worker saw what he thought was a bite mark on the inside of Arochi's forearm. Another co-worker noticed a bruise on his forearm and a couple of scratches and cuts on his arm. Arochi told the co-workers he had gotten the injuries in a fight at the Shops at Legacy, and that the person he was fighting had bitten him while Arochi held him in a chokehold.

Later that week, Arochi offered a different explanation, telling the co-workers he was injured when a tire rim fell on his hand as he was attempting to rotate the tires on his car. Arochi's girlfriend similarly testified that when she saw him on the evening of August 30th, she noticed his right hand was hurt, and there were cuts on his hand and injuries to the knuckle area. When she asked Arochi about this, he said a tire iron fell on his hand while he was working on his wheel rims. Petrosky, Boss, Lofton, and Nickerson did not recall seeing any injuries on Arochi's arms or hands when they were out drinking.

Plano police repeatedly searched Arochi's trash, making several "trash runs" where they would collect the trash, bring it to the police station, and sort through it. Among the items found by police was an undated Post-it note on which the following list of items was written in Spanish:

> Black shirt
> texts from 29th through today's date
> bank bills
> cellular bills

Detective Daniel Caballero, who participated in a couple of the "trash runs" and who translated the note into English for the jury when he read it in court, considered it significant because Arochi was wearing a black shirt when he was last seen with Morris; the texts mentioned in the note were from the day before Morris disappeared; and bank and cellular bills are the kinds of things police typically look for in an investigation. Police also found a bottle of OdoBan, which is an odor remover, and an empty bottle of a multi-purpose cleaner. An earlier "trash run" had found an empty bottle of 409 brand all-purpose cleaner, a generic brand cleaner, paper towels, and rags, among other things.

Alex Buhidar, Arochi's friend, recalled that Arochi initially told him that he and Morris had gone their separate ways in the parking garage, but later said he had blacked out and did not remember what happened. Arochi told Buhidar he had dented the car when he hurt his arm, got mad, and punched it a couple of times. Arochi also told the police he had punched the car. Buhidar

–15–

found this explanation difficult to believe given the size of the dent.

An accident investigator and an expert in accident reconstruction, Officer Kevin Sasso, testified that he did not believe the damage to Arochi's vehicle could have been caused by a punch because the crease was too deep. He testified, "To cause that type of intrusion with a fist would be almost impossible. In fact, one punch wouldn't have done that anyway." He said the damage could not have been caused by an arm or a fist, nor by a metal or rubber object because there was no point of impact or the friction one normally sees when a vehicle hits an object—no tears, smears, or smudges in the metal. He testified that the damage was consistent with a "soft impact," such as "the body, the buttocks, the hips, maybe a head." Richard Schneider, a car estimator with a Chevrolet dealership, reviewed pictures of the damage to Arochi's car for the Plano police and similarly concluded the damage was not consistent with someone punching it or dropping a tire rim on it.

On September 26, 2014, detectives obtained a warrant to seize Arochi's car. When, however, the police arrived at Arochi's residence in Allen to execute the warrant, the car was not there. They used the GPS tracking device to locate the car, finding it in the parking lot of a Plano restaurant where appellant and his girlfriend were having dinner. Officers seized the car and towed it to the Plano Police Department for processing. More photos were taken, again showing the damage to the right front fender.

The car was put up on a lift and bits of vegetation were found wedged under the car near the wheel base; there were also scraping marks on the undercarriage. A research botanist, Barney Lipscomb, identified three types of grasses from the plant material found underneath Arochi's car, i.e., crab grass, Bermuda grass, and the "hairy seed paspalum," and all three are common throughout North Central Texas. He testified that the "hairy seed paspalum" is more commonly found in wet, damp areas, pond areas, ditch areas, off-road areas, low wooded areas, and that the

sample was of recent origin, meaning it was collected during the plant's 2014 flowering or growing season—May through November.  Unlike crab grass or Bermuda grass, the hairy-seed paspalum is not commonly found in yards or along main or paved roads.

Based on the security camera video of Arochi at the Kroger gas station, detectives suggested that the CSI technicians focus—because the interior of the car had been processed—on the trunk area.  They sprayed BlueStar inside the trunk, and a "minor fluorescence" was observed in two spots on the driver's side of the trunk floor mat.[6]  No other areas of the trunk reacted.  The areas that fluoresced were marked with a white Sharpie pen, and photographs showing the marked areas of the trunk mat—the Bluestar reaction itself could not be photographed—were introduced into evidence.  According to Neil Carnes, the Plano police criminalist who conducted the examination, the Bluestar reaction was very slight, but there was a reaction, and because of that it was marked for further investigation.  The mat was removed from the trunk for further testing.  A technician, Brittney Vleer, swabbed the lining, or the weather stripping rubber seal at the edge of the trunk opening, reasoning it was a location that might be difficult to completely clean and it was where someone might rest a heavy load if they were putting it into the trunk.  Detectives then returned the car to Arochi.

Samples of the two areas of the trunk mat that fluoresced were sent to the North Texas Health Sciences Center (NTHSC) DNA Laboratory, which conducted a preliminary test that looked for whether any type of blood—not just human blood—was present.  The preliminary test results were negative.  A NTHSC DNA analyst, Christina Capt, swabbed the areas of the trunk mat that reacted with BlueStar, and from those swabs two DNA profiles were obtained.  Both were identified as matching Morris's DNA profile, with the possibility of a random match at 1 in 1.7

---

[6] Bluestar detects the iron in blood and it can react to some household cleaners, bleach, and vegetation.  It can react with other types of bodily fluids, semen, and saliva if there is blood in them, but standing alone it will not react on any bodily fluids other than blood.

quintillion Caucasians. Capt testified that the amount of DNA in the two samples recovered from the trunk mat was 150 picograms per microliter and 25.5 picograms per microliter. Capt testified that this was "low level" of DNA, but it was a level from which "we were able to readily get a full complete DNA profile from." Asked if she had an opinion if these results were consistent with "touch DNA" or some type of bodily fluid, Capt said they "would be more likely to be a more significant source of DNA, such as a bodily fluid." She also testified that if the DNA in the samples was from "epithelial contact," she "would expect that it would have to be in an area of extensive epithelial contact," such as a shirt a person wore all day or on a regular basis. She added that "for brief touch, no, I wouldn't expect to observe results like this."

The swab taken from the trunk's lining was sent to a different DNA lab for testing, Bode Cellmark. A DNA analyst with that lab, Nicholas Bradford, explained that they developed a DNA profile from the swab, and the DNA obtained from the swab of the trunk's lining matched Morris's DNA profile. Another Bode Cellmark DNA analyst, Elisa Caron, testified that the possibility of a random match was 1 in 7.6 quintillion Caucasians. Bradford testified that the amount of DNA in the sample taken from the trunk's lining was 7.5 nanograms per microliter, or 75 picograms,[7] which was "quite a bit" of DNA. He added that DNA obtained from a touch sample "would be much lower, somewhere below zero or 0.01 nanograms per microliter."

Warrants for Arochi's arrest, the search of his family's house, and the search of his car were executed on December 12, 2014. More photos of the car were taken on December 17th, this time showing that damage previously seen on the right front side had changed in appearance from the previous photographs.

The evidence showed that the Camaro had been returned to Arochi ten or twelve days after the police seized it from the parking lot of a restaurant on September 26th, and photographed and

---

[7] Bradford explained that a nanogram is bigger than a picogram by a factor of ten.

processed it for evidence. Two photos that were shot from the nearly the same angle show the change in the car's appearance during the investigation. The first photo, State's exhibit 173, was taken on September 4, 2014, following Arochi's third interview with the police, and the second, State's exhibit 203, was taken on December 17, 2014:[8]



The defense called four witnesses to testify. In addition to the forensic dentist mentioned earlier, Dr. Brumit, the defense called Christy Wilson, the evidence supervisor for the Plano Police Department. Testimony from Brittney Vleer, the CSI technician, had shown that the Camaro's trunk mat was removed from the trunk and put in a box, but this box was too large to fit into the evidence locker, so it was "closed as best as it can be" and left unsealed "in the secured lab" for about three days before it was taped up and sealed. Only people in the CSI unit had a key to the lab, though the detectives could go in there. Wilson testified that leaving an unsealed box in the property area would have been a breach of protocol. The defense also called LaTarence Dunbar, a private security contractor, who testified that he met Morris at a nightclub in Uptown sometime around August 22nd or 23rd of 2014, shortly before her disappearance, and that he reached out to Morris several days later on Facebook and invited her to an event, but she never responded.[9]

---

[8] No witness actually testified that someone attempted to repair the damage to the fender, but (as we note later in this opinion) the evidence before the jury, which included numerous photos of the car that were taken during the investigation, would have allowed them to reasonably infer that this occurred. We include the photos exactly as they appear in the record.

[9] Detective Benzick testified that he did not know exactly what Dunbar's motive was in sending that message to Morris, but he did not believe the information provided by him was relevant to this case.

Robert Aguero, a specialist in cell phone forensics and cell tower data analysis, also testified for the defense. He reviewed the cell phone records for the time after Arochi's car left the parking garage and testified that records for both Arochi's and Morris's phones showed that after 4:00 a.m. they were only making data connections with the cell towers. He said the three types of cell phone usage were phone calls, text messages, and data connections, and that data connections were the least reliable way of determining where a cell phone is located. Determining the likely location of cell phones based only on the data activity with the cell towers was not possible, according to Aguero. Detective Benzick testified in rebuttal that his review of the cell phone records was accurate and that he had discussed his opinion—and reviewed all of the maps and diagrams he prepared—with people from the phone company prior to his testimony.

## DISCUSSION

### 1. Sufficiency of the Evidence

In his first issue, appellant asserts the evidence is insufficient to prove he committed the offense of aggravated kidnapping.

When determining whether the evidence is sufficient to support a criminal conviction, we apply the well-established standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We view the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 313; *Brooks*, 323 S.W.3d at 899. The jury, as the fact-finder, may make reasonable inferences from the evidence presented at trial in determining an appellant's guilt. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). When there is conflicting evidence, we presume the fact-finder resolved those conflicts in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the trier of fact's determinations

–20–

of a witness's credibility and the weight to be given their testimony. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. Our role as an intermediate appellate court is restricted to guarding against the rare occurrence when a fact-finder does not act rationally. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (citing *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009)).

The standard of review is the same for direct and circumstantial evidence cases. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Circumstantial evidence is as probative as direct evidence in establishing the guilt of a defendant, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13. Each fact need not point directly and independently to an appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id*.

The indictment in this case alleged that on or about the 30th day of August, 2014, in Collin County, Texas, appellant did:

> [T]hen and there, with the intent *to inflict bodily injury* [emphasis added] on Christina Morris, intentionally or knowingly abduct Christina Morris by restricting the movements of said Christina Morris without her consent so as to interfere substantially with her liberty, by moving her from one place to another or confining her, with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found;
>
> then and there, with the intent *to violate or abuse sexually* [emphasis added] Christina Morris, intentionally or knowingly abduct Christina Morris by restricting the movements of said Christina Morris without her consent so as to interfere substantially with her liberty, by moving her from one place to another or confining her, with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found;
>
> then and there, with the intent *to terrorize* [emphasis added] Christina Morris, intentionally or knowingly abduct Christina Morris by restricting the movements of said Christina Morris without her consent so as to interfere substantially with her liberty, by moving her from one place to another or confining her, with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found[.]

A person commits the offense of aggravated kidnapping "if he intentionally or knowingly

–21–

abducts another person with the intent to . . . inflict bodily injury on him or violate or abuse him sexually," or "terrorize him or a third person." Tex. Penal Code Ann. § 20.04(a)(4), (5). "'Abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id*. § 20.01(2). "'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id*. § 20.01(1). "Restraint is 'without consent' if it is accomplished by . . . force, intimidation, or deception." *Id*. § 20.01(1)(A).

The gravamen of kidnapping and aggravated kidnapping is the act of "abduction." *Schweinle v. State*, 915 S.W.2d 17, 19 n. 2 (Tex. Crim. App. 1996). The State argues there are two theories that explain how appellant abducted Morris, i.e., he either put her in the trunk of his car while they were still in the parking garage, or persuaded her to get in his car and later abducted her when she tried to withdraw her consent.

The evidence showed appellant was the last person to be seen with Morris. Friends testified that she was upset with Foster and that she called him repeatedly to come and pick her up before she left Petrosky's apartment with appellant during the early morning hours of Saturday, August 30, 2014. Security camera footage showed them walking into the 5725 Legacy Drive parking garage together at 3:55 a.m., and appellant's car backing out of its parking space there at 3:57 a.m., leaving the garage at 3:58 a.m. Morris was never seen alive again. Their cell phone records showed their phones were pinging off of the same cell towers after appellant's car left the parking garage, and the last activity on Morris's phone was at 4:48 a.m. on August 30, 2014. She was supposed to be at work the following morning and her co-workers testified that she was not one to skip work, particularly since it was going to be a busy day. Morris's car did not leave the garage where it was parked, according to the security cameras. Her father drove it home approximately

two days later, after her disappearance had been reported to the police.

At around 10 a.m. on August 30th, appellant stopped at a Kroger gas station and filled his car up with gas, and security camera video showed him wiping off the passenger side of his car and using a squeegee to clean the trunk area. Morris's DNA was found on the mat in the trunk of appellant's car and on the weather stripping rubber seal around the edge of the trunk opening—an area where someone might rest a heavy load if they were putting it into the trunk. Morris's friends and family testified that she was afraid of the dark and that she would never walk anywhere alone in the dark or willingly climb into the trunk of a car. Her father said she was claustrophobic and that being in the trunk of a car would have been terrifying for her.

Appellant was late to work on the Saturday morning after the party at Petrosky's apartment, and co-workers noticed injuries to his hand and arm. Appellant told them he had gotten the injuries in a fight at the Shops at Legacy, and that the person he was fighting with bit him. Other testimony, however, indicated he did not have those injuries before he left Petrosky's apartment. Appellant later told co-workers he was injured when a tire rim fell on his hand as he was attempting to rotate the tires on his car. Appellant's car had a fresh dent on the right front fender, and he told friends and the police the dent occurred when he got angry and punched his car after he hurt his hand. However, the jury heard testimony that such a dent could not have been caused by an arm or fist and that it was more consistent with a "soft impact" such as a human body, buttocks, or head. The jury could have reasonably found from such evidence that appellant had been involved in a violent struggle.

Appellant initially told the police he only walked Morris to the edge of the apartment building because they were parked in different garages, but later admitted he walked Morris to the 5725 Legacy Drive parking garage when confronted with security camera video showing the two of them entering that garage together. He said that they went their separate ways before reaching

their cars, yet parking garage security camera footage showed appellant, Morris, and others in the group all arriving at the 5725 Legacy Drive parking garage at around the same time and that appellant's car was parked one space across and one over from Morris's car. Appellant claimed Morris was talking to someone on her cell phone as she walked off in another direction, and he was not paying attention to her conversation because he was talking to his girlfriend on his cell phone. When the detective asked appellant if she could look at his phone log and see when he called his girlfriend that morning, appellant said they were texting. But appellant's cell phone records show that he texted his girlfriend at 10:44 p.m. on Friday, August 29, 2014, hours before he and Morris left Petrosky's apartment together, and that he did not text his girlfriend again until the following morning, on August 30th, at 10:52 a.m. Cell phone records also show that Foster received a phone call from appellant's phone at 3:50 a.m. on August 30th, and text messages at 3:53 a.m. and 3:55 a.m., just before Morris and appellant entered the parking garage together. Furthermore, appellant told the police he drove home from the party on Legacy Drive to Highway 75, when the cell phone and toll road records indicated he drove on the Dallas North Tollway to Highway 121.

The evidence also shows appellant washed his car at an automatic car wash on the morning of September 3, 2014, after he was contacted by Morris's stepmother and boyfriend, who were looking for Morris and called appellant because he was the last person seen with her. There was evidence appellant vacuumed the passenger side floorboard of his car before speaking with the police. The police found several bottles of all-purpose cleaners, an odor remover, paper towels, and rags in the trash at appellant's home during the "trash runs." They found a note written in Spanish that listed the following items: Black shirt, texts from 29th through today's date, bank bills, cellular bills. As the detective who translated this note into English testified, the contents were significant because appellant was wearing a black shirt when he was last seen with Morris;

–24–

the texts mentioned in the note are from the day before Morris disappeared; and bank and cellular bills are the kinds of things police typically look for in an investigation.

Additionally, jurors had the photographs of the Camaro taken in September, October, and December of 2014, showing the change in the car's appearance throughout the investigation. The December 17th photographs still showed damage to the same part of the vehicle, but the shape of the dent had changed, and the jury could have reasonably inferred that appellant or someone acting on his behalf had tried, unsuccessfully, to hammer or pound out the dent from the underside of the fender.

The jury could have certainly concluded from the evidence in this case—e.g., Arochi's numerous false, misleading, and/or inconsistent statements to investigators; the efforts to clean his car after Morris's disappearance; the note and the cleaning products found in his trash; the fact that the shape of the dent in his car changed during the course of the investigation—that Arochi was attempting to remove or conceal incriminating evidence, which is probative of his guilt. "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Appellant offers several arguments for why the evidence is insufficient. He argues there is no evidence regarding how or when Morris's DNA was transferred to the trunk and that the DNA could have resulted from cross-contamination through the mishandling of evidence. He also claims there is no proof the DNA was from blood or any other bodily fluids. The jury heard testimony that the Camaro's trunk mat was kept in a box in a secured lab for several days before it was taped up and sealed, and that the detectives had access to the lab. The defense argued at trial, and appellant maintains on appeal, that the DNA could have been transferred to the trunk through cross-contamination, but there is no actual evidence any cross-contamination ever

occurred. The testimony from Christina Capt was that the DNA samples taken from the trunk mat were more likely to be from "a more significant source of DNA, such a bodily fluid," rather than "epithelial contact." Nicholas Bradford testified that there was "quite a bit" of DNA in the sample taken from the trunk lining, and that the amount of DNA from a touch sample would have been much lower. Moreover, Morris's DNA was found in an area where, according to her friends and family, she never would have gone or remained. There is no evidence she would have willingly gotten into the trunk of a car, and the jury heard testimony that such an experience would have been terrifying for her. And the evidence showed that the areas in the trunk of appellant's car that fluoresced when sprayed with Bluestar, an agent that reacts to the iron in blood and certain other substances including household cleaners, did not react to a preliminary test that reacted only to blood. The jury could have concluded appellant attempted to remove incriminating evidence from the trunk of his car, leaving DNA and a trace of the cleaners behind. *See id.*

Appellant also argues there is no evidence Morris was abducted by him, and that kidnapping requires the abduction of a live person. To be sure, a dead body cannot be kidnapped. *Gribble v. State*, 808 S.W.2d 65, 72 n. 16 (Tex. Crim. App. 1990). However, Morris was clearly alive when she entered the parking garage alone with appellant, and there is evidence from which the jury could have reasonably concluded that she was abducted by him. There were no signs of a struggle in the parking garage. But cell phone records show their phones were pinging off of the same cell towers after appellant's car drove out of the parking garage at 3:58 a.m. Morris's car never left the garage, according to the security cameras. Further, Morris's and appellant's cell phones both connected with the same cell tower located at Granite Parkway, near the Dallas North Tollway and Highway 121, and this occurred *after* appellant's car passed the Highway 121 toll road gantry at 4:08 a.m., heading northeast—away from the Granite Parkway cell tower and in the opposite direction of Morris's home in Fort Worth. Morris was determined to go home after the

party, according to her friends, and there was testimony that she would not have missed work the following day. The jury could have reasonably inferred from such evidence either that appellant quickly abducted Morris while they were still in the parking garage, or that he persuaded her to get in his car—possibly by offering to drive her home—and drove her away from the garage, later abducting her when she protested or attempted to withdraw her consent. Regardless of whether Morris was in the trunk or a passenger when appellant's car left the garage, there is sufficient evidence to support the abduction element.

Another argument made by appellant is that his false, misleading, and/or inconsistent statements do not prove Morris was abducted. He cites *Hacker v. State*, 389 S.W.3d 860 (Tex. Crim. App. 2013), a case where the court held that a defendant's false statements could not be the sole proof of guilt and that there must be some other evidence the crime occurred. *Id*. at 872.

In this case, there is such evidence. The jury could have reasonably concluded Morris was abducted and that appellant acted with the requisite intent in the abduction, e.g., he intended to terrorize her or inflict bodily injury, based on appellant's false, misleading, and/or inconsistent statements; the DNA evidence; the cell phone records; the toll road records; appellant's injuries; the damage to his car; and the other evidence in this case. The jury could have concluded any person would have been terrorized by being placed in the trunk of a car—especially Morris, who according to her friends and family was afraid of the dark and claustrophobic. "[T]he fear of anticipated infliction of imminent bodily injury or death caused by a kidnapping ordeal is sufficient to indicate that the defendant intended to terrorize the victim after abducting him." *Lavarry v. State*, 936 S.W.2d 690, 694 (Tex. App.—Dallas 1996, pet. dism'd) (citing *Jernigan v. State*, 706 S.W.2d 813, 821 (Tex. App.—Fort Worth 1986, pet. ref'd)). In addition, there were injuries on appellant's right arm and hand that were consistent with hitting someone. Indeed, he claimed he had gotten the injuries in a fight at the Shops at Legacy, and that the person he was fighting with

bit him. The jury also heard testimony that a dent like the one in appellant's car could not have been caused by punching the car—as appellant alleged—and that it was more consistent with a "soft impact" like a human body, buttocks, or head. *See Laster*, 275 S.W.3d at 524 ("'[O]ne's acts are generally reliable circumstantial evidence of one's intent.'") (quoting *Rodriguez v. State*, 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.)).

Appellant next argues there was evidence before the jury that the damage to his car and the injuries to his arm and hand were caused by something other than an altercation with Morris. In addition to the evidence we have already discussed, appellant calls our attention to the fact that Buhidar testified that appellant may have told him before the 29th of August about having hurt his arm when something fell on it as he was working on his car, although he could not remember exactly when the conversation took place. Buhidar said appellant never mentioned any damage to the car when they went out together on the night of August 30th, and Buhidar did not see any injuries on appellant's hand. Officer Sasso, the accident investigator, admitted he did not know how the damage to appellant's car occurred. And the State's digital media expert, who conducted a frame-by-frame analysis of the security camera footage, admitted it was impossible to determine if there was any damage to appellant's vehicle when it left the parking garage.

The jury, however, was the sole judge of credibility and the weight to give to the testimony of witnesses. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all of the evidence or testimony, and weigh the evidence as it sees fit. *Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). When the record supports conflicting inferences, as it does here, we presume the trier of fact resolved those conflicts in favor of the State and defer to that determination. *Clayton*, 235 S.W.3d at 778. We do not become a "thirteenth juror" and re-evaluate

the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Reed v. State*, 158 S.W.3d 44, 46 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Our task as a reviewing court is to ensure the evidence presented can actually support a conclusion that the defendant committed the crime. *See Williams*, 235 S.W.3d at 750. Based on the cumulative force of all the evidence in this case[10] when viewed in the light most favorable to the verdict, and considering the reasonable inferences to be drawn from that evidence, we conclude a rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt. Consequently, the evidence is sufficient to support the conviction, and we overrule appellant's first issue.

### 2. Lesser-Included Offenses

In his second issue, appellant contends the trial court erred in denying his request for the jury to be charged on the lesser-included offenses of kidnapping and unlawful restraint.

In analyzing a claim of jury charge error on appeal, we must first determine if error exists. *See Almanza v. State*, 686 S.W.2d 157, 173–74 (Tex. Crim. App. 1985); *see also Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If it does not, the inquiry ends. *See Price*, 457 S.W.3d at 440. If, however, we find error in the charge, we next consider whether an objection to the charge was made and analyze the error for harm. *Id.* Where, as in this case, error was properly preserved by a timely objection to the charge, reversal is required only if the error was calculated to injure the rights of the defendant, which has been defined to mean there is "some harm" caused to the defendant. *Almanza*, 686 S.W.2d at 171; *see also Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009).

A lesser-included offense should be submitted when (1) the lesser offense is included

---

[10] The evidence in this case fills over thirty-five volumes of reporter's record and includes hundreds of exhibits. The trial lasted two weeks; over seventy witnesses testified.

within the proof necessary to establish the offense charged and (2) there is some evidence that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *Campbell v. State*, 149 S.W.3d 149, 152 (Tex. Crim. App. 2004). As the State admits, kidnapping and unlawful restraint are lesser-included offenses of aggravated kidnapping because they are included within the proof necessary to establish aggravated kidnapping. *See Rogers v. State*, 687 S.W.2d 337, 344 (Tex. Crim. App. 1985) (kidnapping); *Anderson v. State*, 125 S.W.3d 729, 731 (Tex. App—Texarkana 2003, no pet.) (unlawful restraint); *Martinez v. State*, No. 05–04–01491–CR, 2006 WL 1430060, at *2 (Tex. App.—Dallas May 25, 2006, no pet.) (not designated for publication). Therefore, we proceed to the second step of our inquiry and determine if there was evidence demonstrating appellant was guilty *only* of the lesser-included offenses.

The second step is a fact issue based on the evidence presented at trial. *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). Anything more than a scintilla of evidence may be sufficient to entitle a defendant to the lesser-included offense instruction. *Id*. at 385. The evidence must establish the lesser-included offense "as 'a valid, rational alternative to the charged offense.'" *Rice v. State*, 333 S.W.3d 140, 145 (Tex. Crim. App. 2011) (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)). It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence "directly germane" to the lesser-included offense for the fact-finder to consider before an instruction on that lesser included offense is warranted. *Sweed v. State*, 351 S.W.3d 63, 69 (Tex. Crim. App. 2011); *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). The standard may be satisfied "if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations." *Sweed*, 351 S.W.3d at 68.

Beginning with kidnapping, the element that elevates kidnapping to aggravated kidnapping is appellant's intent, i.e., he intended to inflict bodily injury on Morris or violate or

abuse her sexually, or to terrorize Morris. *See* TEX. PENAL CODE ANN. § 20.04(a). To be entitled to a lesser-included offense instruction, appellant has to point to evidence that created an issue about whether only a kidnapping may have occurred, and not an aggravated kidnapping. But the nature of the evidence in this case is such that the only way appellant could have been guilty of only kidnapping was if the jury simply disbelieved the evidence establishing the aggravating circumstances. As we discussed previously, there is sufficient evidence to show an intention to inflict bodily injury on Morris or to terrorize her, and there is no affirmative evidence negating or refuting either intent in such a way that kidnapping would have been a valid alternative. Appellant contends the evidence is subject to more than one interpretation, but his argument relies more on the jury having found he did not commit the offense, not that he kidnapped Morris but lacked the requisite intent.

In addition, because the State alleged and submitted alternative theories, it only had to prove one of these theories. *See Garcia v. State*, No. 01–15–00030–CR, 2016 WL 7011411, at *6 (Tex. App.—Houston [1st Dist.] Dec. 1, 2016, no pet.) (mem. op., not designated for publication) (even if appellant was correct that there was no evidence he used or exhibited deadly weapon, which would have entitled him to lesser-included instruction on kidnapping, he was not entitled to such an instruction because State proved he intended to inflict bodily injury on victim or violate or abuse her sexually, and no evidence negated or refuted this theory). Even if we were to assume the evidence regarding the intention to inflict bodily injury or to violate or abuse sexually is subject to more than one interpretation, the evidence regarding the intent to terrorize is not. The fear of anticipated injury or death during a kidnapping ordeal is sufficient to show an intent to terrorize. *Lavarry*, 936 S.W.2d at 694. Any person being placed in the trunk and driven away without their consent would be terrorized——and Morris's friends and family testified that she was afraid of the dark and claustrophobic. The jury could have disbelieved such evidence, but it was not subject to

–31–

multiple interpretations. *See Sweed*, 351 S.W.3d 68 (it is not sufficient that jury may have disbelieved crucial evidence pertaining to greater offense). Accordingly, appellant was not entitled to a lesser-included offense instruction on kidnapping.

As for unlawful restraint, the element that separates kidnapping from unlawful restraint is abduction, i.e., rather than simply restraining the victim, the defendant must restrain her with the intention to prevent her liberation by secreting or holding her in a place where she is not likely to be found. *See* TEX. PENAL CODE ANN. § 20.01(2), 20.02(a), 20.03(a); *Romero v. State*, 34 S.W.3d 323, 325 (Tex. App.—San Antonio 2000, pet. ref'd) ("Kidnapping is accomplished by abduction, which includes restraint, but unlawful restraint is committed by restraint only."). Hence, to be entitled to an instruction on unlawful restraint, appellant must point to evidence that created an issue about whether he restrained Morris but did not intend to prevent her liberation by secreting or holding her in a place where she is not likely to be found. We find no such evidence in this record. There is evidence showing appellant restrained Morris by placing her in the trunk of his car—a place where she was not likely to be found. There is also evidence showing that appellant attempted to conceal his connection to Morris through false, misleading and/or inconsistent statements to the police, to his co-workers, and to Morris's friends and family, about where he last saw her; and that he cleaned his car, particularly the trunk area, immediately after he was first contacted by Morris's family regarding her whereabouts. There is, meanwhile, no evidence negating or refuting the finding that appellant intended to prevent Morris's liberation, and he does not cite such evidence in his brief. We conclude appellant was not entitled to a lesser-included offense instruction on unlawful restraint, and we overrule appellant's second issue.

### 3. Change of Venue

In his third issue, appellant argues the trial court erred in denying his motion to change venue because (1) there was so great a prejudice against him in Collin County he could not obtain

a fair and impartial trial there; and (2) the State failed to controvert his affidavits with counter-affidavits.

The standard for review on appeal from a ruling on a motion to change venue is abuse of discretion. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). The trial court's decision concerning a motion to change venue will be upheld if it falls within the zone of reasonable disagreement. *Id.* Section 31.03(a) of the Texas Code of Criminal Procedure provides that a change of venue may be granted if the defendant establishes that "there exists in the county where the prosecution is commenced, so great a prejudice against him that he cannot obtain a fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 31.03(a). To justify a change of venue based on media attention, a defendant must show the publicity was pervasive, prejudicial and inflammatory. *Gonzalez*, 222 S.W.3d at 449. Widespread publicity by itself is not considered inherently prejudicial. *Id.* Even extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage. *Id.* "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 381 (2010). In examining whether pretrial publicity is prejudicial and inflammatory, a trial court may take three matters into consideration; (1) the nature of the publicity, (2) any evidence presented at a change of venue hearing, and (3) testimony received from veniremembers at voir dire. *Gonzalez*, 222 S.W.3d at 450. News stories, whether from print, radio or television, that are accurate and objective in their coverage are generally considered not to be prejudicial or inflammatory. *Id.*

The credibility or means of knowledge of persons making an affidavit for a change of venue may be attacked by the affidavit of a credible person. TEX. CODE CRIM. PROC. ANN. art. 31.04. If the State files controverting affidavits, the issue is formed and the trial court must conduct a

hearing on the motion. *Id.* If the State does not file controverting affidavits, the defendant is entitled to a change of venue as a matter of law. *Lundstrom v. State*, 742 S.W.2d 279, 281 (Tex. Crim. App. 1986). Affidavits stating that the defendant could receive a fair trial in the county may be sufficient to controvert the affidavits in support of a motion for change of venue. *Id.* at 286–87 (op. on reh'g); *see Jones v. State*, Nos. 05–07–01234–CR, 05–07–01235–CR, 2008 WL 4881121, at 4 (Tex. App.—Dallas Nov. 13, 2008, no pet.) (not designated for publication) ("When the State's affiants swear the defendant can receive a fair trial, the State has complied with article 31.04 and controverted the defendant's affidavits."); *see also Halford v. State*, No. 10–16–00358–CR, 2017 WL 4079644, at *5 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op., not designated for publication) (affidavits stating the defendant could receive a fair trial in the county are sufficient to controvert affidavits in support of motion for change of venue); *Saldana v. State*, No.11–09–00247–CR, 2011 WL 846095, at *11 (Tex. App.—El Paso March 10, 2011, pet. ref'd) (mem. op., not designated for publication) ("Affidavits in support of the State's position, as here, may generally deny that there exists so great a prejudice against the defendant or a dangerous combination against the defendant that he cannot expect a fair trial.").

Appellant's motion to transfer venue was supported by affidavits from appellant and two others, Lisa Bronchetti and Shelly Gilbert, claiming he could not get a fair trial in Collin County. The State filed objections to the motion to transfer venue and attached ten controverting affidavits asserting that appellant could receive a fair trial from an impartial jury in Collin County. However, the State's affidavits began with the notary, Shana Turney, a legal secretary in the Collin County District Attorney's Office, identified in the space provided for the name of the person who appeared:

> Before me, the undersigned authority, personally appeared [Shana Turney]
> Who, being by me duly sworn, deposed as follows:

Each affidavit then recited the name of the affiant and how long they had been a resident of Collin

County, using the following language:

> My name is [name of affiant].  I am a resident of Collin County, Texas.  I have been a resident of Collin County, Texas for [number] years.

The affiants had the option of checking one of two statements:

> ☐ Before being asked to sign this Affidavit, I have not heard of Enrique Arochi, and I have not heard of Christina Morris, and I have no personal knowledge of the facts of this case. Therefore, in my opinion Enrique Arochi can obtain a fair trial from an impartial jury in Collin County.
>
> ☐ I have heard of Enrique Arochi or Christina Morris, and I do not believe the media coverage to be inflammatory or prejudicial. Therefore, in my opinion Enrique Arochi can obtain a fair trial from an impartial jury in Collin County.

The affidavits were signed by the affiant and notarized by Turney.

Both sides presented evidence at the pretrial hearing held on June 8, 2016.  The defense's witness was Melissa Rougeot, a circulation manager for Star Local Media, which publishes fourteen different community newspapers throughout Collin, Denton, and Dallas Counties.  The defense also offered a number of both local and national print and video news stories about this case, and Rougeot testified about Star Local Media's circulation numbers—i.e., total distribution of 271,510 for all Star Media and approximately 240,000 unique monthly visitors to its web site.  The State called Turney, who testified that she collected the affidavits by going to the McKinney town square and approaching people to see if they would be willing to sign affidavits.  She was accompanied by three other people, two of whom were prosecutors; the third person was an intern.  Ten Collin County residents signed affidavits.  Two people she contacted refused to give affidavits: One resident said she believed appellant was guilty because her children went to Allen schools; the other refused to discuss the matter.  It took approximately forty-five minutes to gather the affidavits.

The State also called Tim Wyatt, a public information officer for the Collin County Commissioner's Court and, prior to that, a reporter for the Dallas Morning News for 21 years.  He

testified regarding the population of Collin County, which was around 914,000 people according to the Census Bureau, and the internet traffic to Collin County's web site—approximately 300,000 average monthly visitors, with a "hit rate" of about 1.6 million—as well as how the internet has expanded the reach of local media both numerically and geographically. The State's last witness was a jury clerk, Tammy Bledsoe, who testified that the Collin County District Clerk's office could summon a panel of 600 potential jurors, if needed. The State also offered various print and video news stories of appellant's interviews to the media. The State asked the trial court to take judicial notice of the media in the courtroom, which included Dateline NBC and CBS 48 Hours, both national news television programs. The trial court ultimately denied appellant's motion to change venue, finding there was no credible evidence appellant was being denied a fair trial or that the news coverage, though extensive, was prejudicial.

Appellant contends the State's affidavits were deficient in both form and substance. He argues the affidavits were deficient in form because the notary improperly filled out the affidavits, putting her own name in the blank intended for the person deposed. There is no recitation, in other words, that the individual signing the affidavit appeared before the notary—Shana Turney. Instead, the names are juxtaposed, an error the trial court impliedly deemed insufficient to warrant exclusion. The State points out that this did not affect the validity of the affidavits, and we agree. Each affidavit contains the signature of the affiant, states it was "sworn to and subscribed before" the notary, and was officially certified to by the notary with her seal of office. *See* TEX. GOV'T CODE ANN. § 312.011(1) ("'Affidavit' means a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office."). We decline to unnecessarily elevate form over substance, as appellant would have us do. *See, e.g., Higgins v. Randall Co. Sheriff's Office*, 257 S.W.3d 684, 688 (Tex. 2008) (declining to elevate form over substance and concluding affidavit

of indigence was adequate to fulfill fundamental purpose of the rule).

Appellant also claims the affidavits were deficient because they did not question either the credibility of appellant's affidavits or the means of knowledge on which they were based. However, Texas law provides that the State's controverting affidavits may generally deny that there existed too great a prejudice against the defendant for him to receive a fair trial. *Lundstrom*, 742 S.W.2d at 286–87. "[A] state's affiant could infer from his belief that appellant can receive a fair trial in the county that the appellant's affiants must necessarily lack an adequate means of knowledge with regard to their statements that appellant cannot receive a fair trial," and "[t]hat inference could be made regardless of whether the State's affiant knows appellant's affiants or whether the State's affiant believes that appellant's affiants are not credible as a general matter." *Busby v. State*, 990 S.W.2d 263, 267 (Tex. Crim. App. 1999). The affidavits in this case stated that appellant could receive a fair trial from an impartial jury in Collin County, and this was sufficient to put the matter at issue. *See Lundstrom*, 742 S.W.2d at 286–87.[11]

Turning to that substantive question, we conclude the trial court acted within its discretion in denying the motion to change venue because the publicity was not pervasive. While there was evidence of extensive media coverage of this case, there was no evidence the publicity was so pervasive it affected appellant's right to a fair trial. At voir dire, 101 of the 125 panelists who were summoned indicated in their written juror questionnaires that they had read, seen, or heard media or internet coverage of the case, but 89 of them responded that if the judge instructed them that the law required them to make a decision in the case based solely on the evidence and testimony presented at trial in open court, they would follow that instruction. Thus, only 12 people out of

---

[11] The defense objected to both the form and substance of the State's affidavits at the pretrial hearing, and the trial court granted the defense a running objection. The State cites the general rule that even if a defendant is entitled to a change of venue as a matter of law, he waives his right to a change of venue as a matter of law if he puts on evidence concerning the reasons for the change of venue and allows the State to do so. *See Lundstrom*, 742 S.W.2d at 282; *Taylor v. State*, 93 S.W.3d 487, 496 (Tex. App.—Texarkana 2002, pet. ref'd); *Jones*, 2008 WL 4881121, at 4. Because we conclude appellant was not entitled to a change of venue as a matter of law, we need not consider this issue.

the 101 who replied they had read, seen, or heard media or internet coverage of this case indicated that they had formed an opinion about the case they would be unable to set aside. In *Gonzalez*, by contrast, out of 180 members of the panel, 121 were familiar with the case and 58 had formed an opinion that they would not be able to set aside. The court nevertheless found that "[t]he fact that there were a number of panelists that had heard of the case, or that could not set aside their opinions on the case," did "not establish that the pretrial publicity permeated the community to such an extent that the decision to deny the motion for a change of venue was outside the zone of reasonable disagreement." *Gonzalez*, 222 S.W.3d at 450. Based on this record, we similarly conclude that appellant did not establish that the pretrial publicity "permeated the community to such an extent" that the trial court's denial of the motion to change venue was an abuse of discretion.

While a lack of pervasiveness is enough to sustain the trial court's ruling, we further conclude appellant failed to meet his burden of showing the pretrial publicity was prejudicial and inflammatory. *See id*. at 450–51. News stories that are accurate and objective in their coverage are generally not considered prejudicial or inflammatory. *Id*. at 451. In *Gonzalez*, for example, a surveillance video of the murder, described by the defendant as "gruesome and disturbing," was widely played on media outlets prior to trial. *Id*. But because the same video was introduced in its entirety into evidence at trial, this coverage was not considered prejudicial or inflammatory. *Id*. at 452. In this case, appellant complains that actual and identifiable prejudice was shown because venire members were aware "that Morris's blood had been found in [a]ppellant's car," and that "she was presumed dead." Appellant calls our attention to various comments in the questionnaires of 34 venire members, many of them indicating an awareness of Morris's "blood" or DNA having been found in the trunk of appellant's car, that she was still missing, her body had not been found, and that appellant was last person to be seen with her. However, these facts were before the jury at trial. Like the surveillance video in *Gonzalez*, the accurate reporting of facts later introduced at

trial does not show prejudicial or inflammatory coverage. *See id.* It is also worth noting that of the 34 questionnaires that are excerpted in appellant's brief for various comments made in their questionnaires regarding this case, 25 said they would be able to follow the judge's instructions and decide the case based solely on the evidence and testimony presented; only 9 indicated they would be unable to do so, and none of those 9 prospective jurors ultimately served on the impaneled jury. Additionally, appellant was able to include his own version of events in the media coverage by giving interviews to local media. The State introduced a transcript of an interview appellant gave to a reporter with Star Local Media and recorded interviews he gave to various local news stations—i.e., local television news reports; an interview with a Spanish language television station; and an audio recording of an interview with a local radio station. Although 14 members of the panel said they had formed an opinion about the case that they would be unable to set aside,[12] this does not necessitate a conclusion that the publicity was inflammatory or prejudicial. *See id.* ("Although large number of panelists were disqualified for cause because they were unable to set aside their opinion of appellant's guilt, those circumstances did not require a conclusion that the publicity was inflammatory or prejudicial."). We conclude the trial court's denial of the motion to change venue was well within the zone of reasonable disagreement, and that the court did not abuse its discretion. We overrule appellant's third issue.

### 4. Motion to Suppress Evidence

In his fourth issue, appellant contends the trial court erred in denying his motion to suppress the evidence obtained through the installation of a tracking device on his Camaro without probable cause.

A motion to suppress is reviewed under a bifurcated standard. *Johnson v. State*, 68 S.W.3d

---

[12] In addition to the twelve people mentioned earlier, two others indicated both that they had not read, seen, or heard any media or internet coverage of the case and that they would not follow the judge's instruction to make a decision based only on the evidence and testimony presented in court. One person did not respond to either question.

644, 652–53 (Tex. Crim. App. 2002). Almost total deference is afforded to the trial court's determination of historical facts because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. Whether a trial court properly applied the law to the facts is reviewed with deference only in so far as it turns on an evaluation of credibility and demeanor, and mixed questions of law and fact are reviewed de novo. *Id*. The evidence is considered in the light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). The trial court's ruling should be upheld so long as it is correct under any valid legal theory. *See Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012).

On September 4, 2014, Detective Brian Pfahning of the Plano Police Department requested the installation of a mobile tracking device on appellant's car pursuant to article 18.21, section 14, of the code of criminal procedure. Detective Pfahning's affidavit in support of the article 18.21 application for the mobile tracking device reads as follows:

> 1. My name is Detective Brian Pfahning, and I am a police officer with the City of Plano Police Department, 909 14th Street, Plano, Texas 75074.
>
> 2. It is hereby requested that Affiant be granted authorization to attach a mobile tracking device to one 2010 Chevrolet Camaro, Texas License Plate DJL8459. Registered owner shows to be Enrique Guiterrez [sic], 1218 Harvard Drive, Allen, Texas 75002.
>
> 3. Affiant has probable cause to believe that criminal activity has been in progress because:
>
> Affiant was assigned to assist with an investigation involving a missing person identified as Christina Morris W/F/07/25/1991. Affiant received the following information through the original police report and information from investigators: Morris was last seen around 0400 hours on August 30, 2014 in the area of a parking garage in the area known as The Shops of Legacy, Plano, Collin County, Texas. As of this date Morris has not been found or heard from. Initial investigation shows a person identified as Enrique Gutierrez was one of the last persons to see Morris around the time she went missing. Gutierrez was interviewed by investigators in regards to the investigation. During the interview, Gutierrez stated he was with Morris but left her alone prior to the last time she was seen and walked to where his car was parked. Gutierrez stated he parked his vehicle in a parking spot near

–40–

the Blue Martini Bar.

Affiant learned from the police investigation that video evidence shows Gutierrez did not park his vehicle by the Blue Martini Bar. In fact, a vehicle matching Gutierrez's vehicle, a dark gray Chevrolet Camaro, was seen leaving a parking garage where Morris was last seen. Video also shows a person matching the clothing and physical description of Guiterrez [sic] and a person matching the physical and clothing description of Morris the parking garage where Morris was last seen. Affiant believes Gutierrez has given false information to Plano Police investigators regarding the investigation of Christina Morris, a missing person.

Further, it is your Affiant's belief that the use of a mobile tracking device is likely to yield information relevant to the investigation of Missing person, Christina Morris who has been missing for 4 days.

A state district judge authorized the mobile tracking device the same day the application was filed.

On May 30, 2016, appellant filed a motion to suppress data obtained from the installation of a mobile tracking device on the defendant's vehicle by a court order. He raised the motion at a pretrial hearing on June 7, 2016, at which time the trial court denied the motion. Later, during a hearing outside the jury's presence, the issue was raised again when the parties were discussing the search warrant of appellant's car executed on September 26, 2014. Appellant had driven away in the car before the police arrived at his house that day to execute the search warrant, but they were able to use the tracker to locate the vehicle in the parking lot of a Plano restaurant. Appellant argued that an improper tracking order tainted the execution of the search warrant. The trial court found the tracking order was proper and that the warrant was a sufficient intervening circumstance even if the tracking order was invalid.

Article 18.21 of the code of criminal procedure authorizes a district judge to issue an order authorizing the surreptitious installation and use of a mobile tracking device for the purpose of tracking the movement of a vehicle. TEX. CODE CRIM. PROC. ANN. art. 18.21, § 14(a)(1). An order authorizing the use of a mobile tracking device may be issued only on the application of an authorized peace officer. *Id*. art. 18.21, § 14(c). That application must be written, signed, and sworn to before a district judge, and it must contain a statement of facts and circumstances that

–41–

provide the applicant with "reasonable suspicion" to believe that (A) criminal activity has been, is, or will be committed; and (B) the installation and use of the device is likely to produce information that is material to an ongoing criminal investigation of the criminal activity described in paragraph (A). *Id.* art. 18.21, § 14(c)(5).

The United States Supreme Court has held that "the Government's installation of a GPS device on a target's vehicle, and its use of the device to monitor the vehicle's movements, constitutes a 'search'" under the Fourth Amendment. *United States v. Jones*, 565 U.S. 400, 404 (2012); *accord State v. Jackson*, 464 S.W.3d 724, 730 (Tex. Crim. App. 2015) ("Consistent with *Jones*, it appears here that the installation of the GPS tracking device and its subsequent employment to monitor Appellee's whereabouts constituted a search for Fourth Amendment purposes."). Based on *Jones*, appellant argues the tracker's placement and use violated the Fourth Amendment because the application to install the tracker failed to establish probable cause.

Detective Pfahning's affidavit identified an offense that he believed to have been committed, i.e., making a false statement to law enforcement officers regarding a missing person. *See* TEX. PENAL CODE ANN. § 37.081(a)(2). The probable cause for this belief was based on appellant's interview with the police, where he stated that he had parted company with Morris before her disappearance because they were parked in different parking garages. Security camera video, however, showed appellant's car leaving the parking garage where Morris was last seen, and security camera video showed both appellant and Morris entering the garage together. This supported the conclusion that appellant, with intent to deceive, knowingly made a false statement to police relating to a missing person. *See id.* In addition, the affidavit stated that the investigation was for a missing person who was last seen in a parking garage, and who had been missing for four days as of the date of the affidavit. We conclude the facts in the affidavit, and the reasonable inferences drawn therefrom, provided probable cause to support the issuance of the tracking

order.[13]

Furthermore, any error in the issuance of the tracking order was harmless. Article 38.23(a) of the code of criminal procedure provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a). The primary purpose of article 38.23(a) is to deter unlawful actions that violate the rights of criminal suspects in the acquisition of evidence for prosecution. *Wilson v. State*, 311 S.W.3d 452, 459 (Tex. Crim. App. 2010). However, if the evidence seized is sufficiently attenuated from the violation of the law, the evidence is not considered to be obtained in violation of the law for the purpose of article 38.23. *Johnson v. State*, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994). To determine whether the discovery of physical evidence is sufficiently attenuated from the violation, we consider (1) the temporal proximity of the violation of law and the seizure of physical evidence; (2) the presence of intervening circumstances; and (3) the purposefulness or flagrancy of the police misconduct. *See State v. Mazuca*, 375 S.W.3d 294, 301–07 (Tex. Crim. App. 2012).

An intervening circumstance, such as obtaining an arrest or a search warrant, can serve to attenuate the taint of any original illegality. *See id*. at 306; *Johnson*, 871 S.W.2d at 751. Appellant argues that the search warrant could not serve as a valid intervening circumstance because the scope of the warrant did not extend to the parking lot of the restaurant where police seized the vehicle, and that the "unlawfully installed tracker" illegally enlarged the scope of the search warrant for the car. But the vehicle was seized pursuant to the search warrant, not the tracking

---

[13] The affidavit established probable cause even though it identified the registered owner of the Camaro according to his middle name, i.e., as "Enrique Gutierrez," which was misspelled in the second paragraph as "Guiterrez." The description of the vehicle was accurate, as was the license plate number, and there was no argument before the trial court that "Enrique Guiterrez" or "Enrique Gutierrez" and Enrique Arochi were not the same person.

order. The only apparent connection between the two is that the police used the tracking device to locate appellant's car at the restaurant, where they seized the vehicle. As the court pointed out in *State v. Jackson*, so long as the circumstance—in this case, the search warrant—intervenes between the inception of the primary illegality, i.e., the "unlawfully installed tracker," and the later discovery of evidence that is alleged to be the "fruit of the poisonous tree," e.g., the trunk mat and the swabs showing the presence of Morris's DNA, it may be appropriately regarded as an "intervening circumstance" in the attenuation-of-taint analysis. *Jackson*, 464 S.W.3d at 733. Moreover, the State is correct that, given such an intervening circumstance in this case, we should emphasize the third factor, which asks whether the police purposefully and flagrantly disregarded appellant's Fourth Amendment rights. *Mazuca*, 375 S.W.3d at 306–07; *see also Jackson*, 464 S.W.3d at 733.

The State argues there was no purposefulness or flagrancy here, and we agree. The officers were acting under the authority of a statute authorizing the installation and use of a tracking device based on a sworn application to a district judge, and a search warrant issued three weeks later. The affidavit in support of the search warrant details additional information gained in the weeks following the issuance of the tracking order, such as an interview with a car estimator who said the damage to appellant's car was inconsistent with his explanation of how it occurred; interviews with appellant's co-workers; the security camera video from the Kroger store showing appellant using a squeegee to clean the back of his car. And the alleged illegality here was not the result of any flagrant or purposeful disregard of appellant's constitutional rights—there was no evidence the police harbored such an intent. Their use of the tracking device may have been purposeful in the sense that investigators were trying to obtain evidence against appellant, but there is no indication they knowingly violated appellant's rights in doing so, and no data from the tracking device was admitted into evidence. Appellant argues that using article 18.21, section 14, for the

–44–

tracking order was itself flagrant misconduct in light of *Jones*. However, the Court in *Jones* simply held that the government's installation of a tracking device was a search under the Fourth Amendment, thereby necessitating probable cause. *Jones*, 565 U.S. at 404. Detective Pfahning stated in his application —and the record shows—he had probable cause to support the issuance of the tracking order rather than reasonable suspicion. Because any theoretical infirmity in the article 18.21 order was sufficiently attenuated from the seizure of evidence, neither the Fourth Amendment nor article 38.23 requires suppression of the evidence. Accordingly, the trial court did not err in denying the motion to suppress. We overrule appellant's fourth issue.

### 5. Jury View

In his fifth issue, appellant argues the trial court erred by overruling his objection to a "jury view" of the Camaro.

The court of criminal appeals addressed the issue of a jury view in *Mauricio v. State*, 153 S.W.3d 389 (Tex. Crim. App. 2005). Although jury views were traditionally disfavored in Texas in criminal cases, the decision to permit a jury view in a particular case is now committed to the trial court's discretion. *Id*. at 393. The decision must be made considering the totality of the circumstances of the case including (1) the timing of the request for the jury view; (2) the difficulty and expense of arranging it; (3) the importance of the information to be gained by it; (4) the extent to which that information has been or could be secured from more convenient sources (e.g., photographs, videotapes, maps, or diagrams); and (5) the extent to which the place or object to be viewed may have changed in appearance since the controversy began. *Id*. In addition, the trial court must provide opposing counsel an opportunity to be heard on the question. *Id*. The trial court also must implement appropriate safeguards to insure fundamental fairness to the accused and to protect the trial's truth-finding function. *Id*. n. 3.

The record shows that the possibility of a jury view of the Camaro was first discussed at a

pretrial hearing held on September 1, 2016, six days before the start of trial and fifteen days before the actual jury view. The trial court noted it had been contacted by the sheriff's department about the logistics of bringing appellant's car to the courthouse. The State told the court that it had been exploring the logistical possibility of bringing appellant's Camaro to trial for a jury view, and argued that it was equivalent to merely publishing an exhibit. The trial court disagreed and raised various logistical and security concerns—including the jury's safety and security; how the defendant would be securely moved to and from the jury view; the effect a jury view would have on the operations of other courts; and how to balance the public's right to be present during a jury view with the court's need to maintain order in the courtroom and assure there was no interference with the trial process. Defense counsel said the defense would have no objection to a jury view of the Camaro. The court was skeptical of how a jury view would be carried out but it did not rule on the State's request, telling the parties that it would "figure it out."

On September 14, 2016, the sixth day of trial, defense counsel raised the issue of the jury view and said he had reconsidered and now objected to the jury view because the car was not in the same condition as when it was first seized and processed by the Plano Police Department. The State told the court that it looked like someone had tried to hammer out the dent from the underside of the right front fender, and that there was still damage to the same fender but "it's been altered since it's been looked at in September and October by the Plano Police Department." Photos taken by the police of the Camaro in September, October, and December of 2014 show the change in the car's appearance.[14] The trial court said it understood that one of the main reasons the State wanted the jury view was that it did not think photographs could adequately display the ability to put someone in the trunk of the Camaro. The State agreed and told the court that it requested the view

---

[14] As noted elsewhere, the police seized appellant's car from the parking lot of a Plano restaurant on September 26, 2014, and returned it to him after photographing and processing it.

because "the depth and dimension and the spa[t]ial relationship of the trunk top to the inside of the trunk just can't be viewed in a flat two-dimensional photograph."

Later that day, after the jury had been excused for the day, the trial court and the parties further discussed logistical and security concerns regarding the jury view. The State told the court its primary desire for the jury view was so the jurors could look at the rear end of the car and see for themselves how high off the ground the trunk was; how someone could be lifted in and out of the trunk; and the damage to the front of the vehicle. The State assured the court no demonstration, such as using a life-sized mannequin in the trunk, was planned; it just wanted the jury "to look at the actual Camaro, look in it, and around it." The court noted some of the security precautions that had been made, which would include the presence of courthouse security personnel, and that the public would have an opportunity to be present during the jury view. At the end of the following day of trial, the State told the court that it intended to call Sergeant Patrick Mulkern as its first witness the next day to testify about the condition of the car and what modifications had been made to it, after which it would request the jury view. The trial court stated that all of the parties would have an opportunity to view the car in the morning after it was brought to the courthouse, and that the court would make its final ruling at that time.

The following morning, September 16, 2016, the trial court began the proceedings by noting the preparations that had been made for the jury view. The court stated that the vehicle had been brought to the courthouse and was in an open parking lot closest to the loading dock. The sheriff's office had set up an area where the public could enter, and exits had been narrowed so security could effectively "wand" people. The trial court had viewed the trunk of the automobile, pointing out that the vehicle's cargo net and trunk mat, which had been removed by the investigators for testing, had been replaced. Although it was not "an exact color match," the court noted that the trunk looked "very similar to the condition of the trunk portrayed in photographs

–47–

[of] the date closest to August 30th, 2014."

Defense counsel told the court that after discussing the matter with appellant, appellant had decided to voluntarily absent himself from the jury view. The defense also renewed its objections to the jury view under rules 103, 104, 105, 401, 402, 403, 902, 902, and 903 of the rules of evidence, again noting the alterations to the car's appearance, particularly the right front fender. The trial court ruled that the trunk and the "spatial relationships" were sufficiently before the jury that an understanding of the size of the trunk and those relationships was relevant. The court said it was unaware of any photographs or video that sufficiently portrayed those three dimensional relationships. The court again noted it had viewed the vehicle after it was brought to the courthouse that morning and that it walked the route the jury would take. Given the trunk's condition, the court did not believe it would be unduly prejudicial for the defense, and that the probative value of the trunk as it was now configured outweighed the prejudicial effect. The trial court overruled the defense's objections.

Sergeant Mulkern testified about the condition of the car and how it had been altered prior to it being brought to court, telling the jury that he was part of the team that retrieved the Camaro on September 26, 2014, from a public parking lot adjacent to a Plano restaurant. He looked at a photograph of the dent in the Camaro taken on September 26, 2014, and said it was consistent with the damage he observed on that date when he first recovered the vehicle. He testified that at some point, ten or twelve days later, the vehicle was released to appellant. Mulkern testified that when the Plano police took the vehicle back into their custody in December of 2014, the damage to the right front area had changed in appearance. He also testified that since December of 2014, the vehicle had been in the continuous possession of the Plano police and was stored in a 20-foot shipping container. When preparing to bring the vehicle to the courthouse, the battery was replaced because it no longer worked after the vehicle had been stored for approximately 14

months. Mulkern added that during the investigation several portions of the trunk—the side walls, the cargo net, and the trunk mat—were removed by the CSI department, but he had attempted to replicate how the Camaro appeared on September 4, 2014, when it was photographed by the crime scene unit.

The State requested that the jury be allowed to view the car, and the trial court granted the request. The court gave the jury detailed instructions, telling them no one would be asking any questions, there would be no testimony, nor would there be any statements; and that there would not be any kind of demonstration. The bailiff would escort them down to the loading dock where the car was parked, and bring them back up to the courtroom after the jury view was over. The court advised them it did not expect the entire process to take more than a half an hour, but that they could "take as much time as you need to look at whatever it is you want to look at without touching, without commenting, without climbing in" the vehicle. After the jury was excused the court gave additional instructions to the gallery, telling them they were free to attend the jury view but did not have to do so. There would be no cell phone use or photography during the view "because for all purposes that's every bit as much . . . my courtroom as this room is." The defense renewed its objections, which were overruled. The court went off the record and the parties left the courtroom for the jury view at 9:17 a.m., and the jury view began at 9:26 a.m. and concluded at 9:31 a.m., with no one testifying or speaking during the view. The defendant was not present. At 9:31 a.m., the trial court announced that the view had concluded and they would reconvene in the courtroom. The parties were back in the courtroom and on the record at 9:39 a.m.

None of the factors listed in *Mauricio* support a conclusion that the trial court abused its discretion. Regarding the timing of the State's request for a jury view, the record shows the matter was first brought to the court's attention five days before the start of trial and fifteen days before the actual jury view. *See Ford v. State*, No. 04–14–00025–CR, 2015 WL 1523020, at *2 (Tex.

App.—San Antonio 2015, no pet.) (mem. op., not designated for publication) (notice filed seven days before trial commenced). Therefore, the record reflects that the request for the jury view was made in a timely fashion.

In addition, although the court raised a number of logistical and security-related issues, the record also reflects that the court, the State, and the courthouse security staff were able to address those issues. The vehicle was brought to the courthouse and arrangements were made with the courthouse security staff to conduct the view in the loading dock area and arrange for security and public viewing. The trial court believed it would not "take much time" for the jury to view the car and that they would be out of the courtroom for no more than thirty minutes. In fact, the parties were out of the courtroom for only twenty-two minutes and the jury view itself took only five minutes. The defendant was not present during the jury view, having chosen not to attend. The record does not indicate that anyone testified or even spoke during the jury view and there was no demonstration of any kind. The trial court could have concluded the difficulty and expense of conducting the jury view were not prohibitive.

As for the third and fourth *Mauricio* factors, the State argued it needed to demonstrate the "spatial relationships" of the trunk in order to show that a person of Morris's size could have fit inside the trunk and left her DNA on the places where it was recovered. The defense had attempted to discredit the DNA evidence by arguing Morris's DNA could have been transferred by the police through the cross-contamination of evidence. Viewing the car in person allowed the jury to conceptualize how Morris's DNA could have been rubbed off on the trunk lining as she was shoved or loaded into the trunk. The trial court could have concluded that a three-dimensional view of the car was essential for the jury to understand the competing theories of the case, and that two-dimensional photographs or video were insufficient. The trial court could have likewise concluded there were no other sufficient sources for this evidence. The State pointed out that bringing a

model of the trunk into the courtroom would have cost "thousands of dollars," and taking photographs of an actual person of Morris's size inside the trunk of the car would have been inflammatory and prejudicial. And photographs, even with a ruler provided for scale, would not provide an adequate perspective of the three-dimensional spatial relationships.

Additionally, the trial court could have concluded the changes in the evidence's appearance between the offense and the jury view were not significant enough to overcome the State's need for the jury view. Although items such as the trunk mat and the cargo netting had been removed from the trunk during the investigation, the State replaced those items with duplicates prior to the jury view. The trial court found that the trunk looked "very similar" to its condition on the offense date, based on photographs that had been admitted into evidence. As for the damage to the right front part of the Camaro, the jury was aware that the damage to the car had changed in appearance over time and photographs admitted into evidence demonstrated the nature of that damage over time—i.e., on September 3rd, September 4th, September 26th, and on December 17, 2014. Accordingly, based on the record before us, we conclude the trial court did not abuse its discretion in granting the jury view. We overrule appellant's fifth issue.

### 6. Motion to Quash the Indictment

In his sixth and final issue, appellant contends the trial court erred in overruling his motion to quash the indictment. Appellant's challenge to the indictment was based on its failure to give any notice of whether the lack of consent was accomplished through force, intimidation, or deception. *See* TEX. PENAL CODE ANN. § 20.01(1)(A) ("Restraint is 'without consent' if it is accomplished by . . . force, intimidation, or deception."). Appellant argues he could not know from the indictment how he allegedly restricted Morris's movements without her consent, and that absent such notice, he was not given enough information to adequately investigate or prepare a defense.

An indictment is generally sufficient to provide a defendant with notice if it follows the statutory language. *Curry v. State*, 30 S.W.3d 394, 398 (Tex. Crim. App. 2000). If a statute defines multiple manner or means of commission in several alternative ways, then the indictment must identify which of the statutory means it addresses. *Id.* But it need not plead evidentiary matters. *Id.* Definitions of terms and elements are essentially evidentiary and need not be alleged in the indictment. *Lewis v. State*, 659 S.W.2d 429, 431 (Tex. Crim. App. 1983). When a statutory term or element is defined by statute, the indictment does not need to allege the definition of the term or element; the definitions of terms and elements are typically regarded as evidentiary matters. *State v. Barbernell*, 257 S.W.3d 248, 251 (Tex. Crim. App. 2008). In some cases, however, an indictment that tracks the statutory language may be insufficient to provide adequate notice, and this occurs "when the statutory language fails to be completely descriptive." *Id.* "The statutory language is not completely descriptive 'when the statutes define a term in such a way as to create several means of committing an offense, and the definition specifically concerns an act or omission on the part of the defendant.'" *Id.* (quoting *Solis v. State*, 787 S.W.2d 388, 390 (Tex. Crim. App. 1990); *Geter v. State*, 779 S.W.2d 403, 405 (Tex. Crim. App. 1989)). Such cases require more particularity to provide notice. *Id.* "Thus, 'if the prohibited conduct is statutorily defined to include more than one manner or means of commission, the State must, upon timely request, allege the particular manner or means it seeks to establish.'" *Id.* (quoting *Saathoff v. State*, 891 S.W.2d 264, 266 (Tex. Crim. App. 1994)).

Appellate courts conduct a de novo review of a trial court's ruling on a motion to quash a charging instrument. *State v. Zuniga*, 512 S.W.3d 902, 906 (Tex. Crim. App. 2017); *State v. Jarreau*, 512 S.W.3d 352, 354 (Tex. Crim. App. 2017) (citing *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)). A de novo review is mandated because the sufficiency of an indictment is a question of law. *Zuniga*, 512 S.W.3d at 906. The trial court's ruling should be upheld if it is

correct under any theory of law applicable to the case. *Id*.

The indictment in this case alleged that appellant restrained Morris "by restricting the movements of said Christina Morris without her consent so as to interfere substantially with her liberty, by moving her from one place to another or confining her." This tracks the statutory language in the definition of "restrain." *See* TEX. PENAL CODE ANN. § 20.01(1). Though appellant argues the indictment does not specify whether Morris's lack of consent was accomplished by force, intimidation, or deception, this is an evidentiary matter that need not have been included in the indictment. An indictment need not specify which means of "without effective consent" it seeks to prove because it is not an act, omission, or conduct of the defendant. *See Curry*, 30 S.W.3d at 398–99. The proscribed conduct of the offense is restricting a person's movement without her consent, and the various methods of proving lack of consent—i.e., force, intimidation, or deception—do not amount to different ways of committing the offense. They are evidentiary matters that need not be pleaded. *See Barbernell*, 257 S.W.3d at 256. We conclude the indictment provided adequate notice and that the trial court did not err in denying the motion to quash. We overrule appellant's sixth issue.

## CONCLUSION

We resolve appellant's six issues against him. The judgment of the trial court is affirmed.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
161208F.U05

–53–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ENRIQUE AROCHI, Appellant

No. 05-16-01208-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 401st Judicial District Court, Collin County, Texas
Trial Court Cause No. 401-80513-2015.
Opinion delivered by Justice Myers.
Justices Bridges and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 11th day of July, 2018.